Barbara SCHNEIDER, Plaintiff,

v.

**NORTHWESTERN UNIVERSITY,**
Defendant.

No. 92 C 7080.

United States District Court,
N.D. Illinois, E.D.

Sept. 28, 1993.

Keith L. Hunt, Keith L. Hunt, Ltd., Laurie Ellen Leader, Northbrook, IL, for Barbara Schneider.

Lawrence I. Kipperman, Patrick Scott Casey, Sidley & Austin, Chicago, IL, Michael C. Weston, Northwestern University, Evanston, IL, for Northwestern University.

### *MEMORANDUM OPINION AND ORDER*

GOTTSCHALL, United States Magistrate Judge.

This matter is before the court on plaintiff's motion to compel. For the reasons set forth below, the motion is granted in part.

### BACKGROUND

Plaintiff Barbara Schneider brings this action complaining of discrimination in the decision denying her tenure and promotion to associate professor status in the School of Education ("School") at defendant Northwestern University ("defendant" or "University"). Plaintiff's tenure application was actually twice the subject of review. First, she was allegedly considered for tenure prematurely during the 1984–1985 academic year. According to plaintiff, male employees were not subjected to premature tenure reviews. Plaintiff further contends that her next tenure review during the 1985–1986 academic year was tainted by the first review.

Defendant's tenure selection process is described at pages 2–4 of its brief in opposition to the motion to compel. Summarizing, the review process commences when the Dean of the School selects four tenured faculty members to form an *ad hoc* committee that reviews the candidate's tenure qualifications. The *ad hoc* committee's identities are known only to themselves and the Dean. As part of its task, the *ad hoc* committee requests evaluations of a candidate's scholarship from outside peer reviewers. The peer reviewers are chosen from a list of names prepared by the

candidate and from committee members' own academic experience.

After reviewing a candidate's dossier, including the peer review letters received, the *ad hoc* committee prepares a report to the Dean recommending the granting or denial of tenure. This report is made available to the candidate and to tenured faculty members within the school. Peer reviewers are not apparently mentioned by name in the report and the names of *ad hoc* committee members are redacted from it as well. The candidate may prepare a written response to the report.

A Faculty Personnel Review Committee ("FPRC") consisting of six tenured members of the School also reviews the candidate's qualifications and makes its own recommendations to the Dean on tenure. Materials considered by the FPRC include the *ad hoc* committee report, the candidate's response, peer review letters from which the identity of reviewers has been redacted, and any other materials in the tenure dossier. Following action by the FPRC, all tenured faculty in the School review the *ad hoc* committee report and take action on the FPRC's recommendation by voting whether to recommend to the Dean that the candidate be granted tenure.

The Dean reviews all the aforementioned materials in formulating a recommendation to the University Provost on tenure. The Dean apparently considers all the reports and materials already discussed, plus other items such as teaching evaluations. It is not clear whether the Dean sees redacted copies of the peer review letters. If the Dean does not recommend tenure, the process ends there and the candidate may appeal. If the Dean recommends tenure, the Provost reviews the Dean's recommendation and makes a decision on whether to forward the candidate's name to the University President and Board of Trustees for approval.

Besides alleging irregularity in the fact that she was given a premature tenure review, plaintiff contends that the Dean orchestrated the negative result in her case by personally taking peer reviews over the telephone. Plaintiff characterizes the phone reviews as negative and she questions whether the Dean accurately transcribed the evaluations made orally.

To date, defendant has produced for plaintiff her own peer review file and materials, as well as those of five candidates considered for tenure by the School within the relevant time frame. Peer review letters are included in this production. On the materials produced, however, the identities of *ad hoc* committee members and peer reviewers have been redacted. Plaintiff moves to compel disclosure of the identities of both the *ad hoc* committee members and peer reviewers that considered her application for tenure. She seeks the same information concerning the other tenure candidates whose files have been produced.[1] Defendant resists disclosure of this information, arguing that it is protected by the qualified academic privilege the Seventh Circuit recognized in *Equal Employment Opportunity Commission ("EEOC") v. University of Notre Dame Du Lac*, 715 F.2d 331 (7th Cir.1983). As defendant sees it, plaintiff has not made the showing of particularized need required to overcome the privilege.

Plaintiff argues that *Notre Dame* is no longer "good law," given the Supreme Court's decision in *University of Pennsylvania v. EEOC*, 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) ("*University of Pennsylvania*"). Plaintiff contends that under *University of Pennsylvania*, she need only show that the identities of peer reviewers and committee members are relevant in order to obtain their disclosure. In making the argument that information concerning comparable candidates should be made available, she cites a number of cases finding that comparative evidence may be used in proving claims of discriminatory denial of tenure. *E.g., Bennun v. Rutgers State Univ.*, 941 F.2d 154, 178 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992); *Brown v. Trustees of Boston University*, 891 F.2d 337, 346 (1st Cir.1989), *cert. denied,* 496

---

1. Plaintiff suggests that this disclosure would be made in another round of production, rather than through inspection of documents in defendant's possession. Plaintiff asks that such production be made without cost to her.

U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990); *Gutzwiller v. Fenik,* 860 F.2d 1317, 1326 (6th Cir.1988); *EEOC v. Franklin and Marshall College,* 775 F.2d 110, 116 (3d Cir. 1985), *cert. denied,* 476 U.S. 1163, 106 S.Ct. 2288, 90 L.Ed.2d 729 (1986); *Namenwirth v. Board of Regents of Univ. of Wisconsin System,* 769 F.2d 1235, 1240 (7th Cir.1985), *cert. denied,* 474 U.S. 1061, 106 S.Ct. 807, 88 L.Ed.2d 782 (1986); *Orbovich v. Macalester College,* 119 F.R.D. 411, 415–416 (D.Minn. 1988).

Since the commencement of this lawsuit, defendant has notified the other tenure candidates whose files have been produced of plaintiff's request for their files. Also, plaintiff's peer reviewers were apparently notified by telephone that plaintiff wished to see their peer review letters. It is not known whether the peer reviewers of other tenure candidates were contacted, and the results of defendant's contacts with plaintiff's peer reviewers are not known. Defendant has reported no objections by peer reviewers to disclosure of their identities, however. Defendant nonetheless objects to plaintiff's requests for discovery, arguing that the peer reviews were requested before the Supreme Court's decision in *University of Pennsylvania,* at a time when reviewers could expect the University would be able to keep its promise that the reviews would be maintained in confidentiality.

## DISCUSSION

As a first step in the determination on this motion, the court looks to the holdings in *University of Pennsylvania* and *Notre Dame.* Both decisions were rendered in the context of enforcement of an EEOC subpoena, but neither side has argued here that a distinct result would be required in private litigation after the conclusion of an EEOC investigation.

The Supreme Court considered the question of whether peer review materials are protected under either a common law privilege or a First Amendment right to academic freedom in *University of Pennsylvania v. EEOC,* 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990). In that case, the University of Pennsylvania had refused to comply with an EEOC subpoena of a female Chinese–American's tenure-review file and the tenure files of five male faculty members identified in her EEOC charge. As here, the claimant alleged that she had been denied tenure on account of impermissible factors, in violation of Title VII. 42 U.S.C. § 2000e-2(a). The Third Circuit had ordered enforcement of the subpoena, rejecting the university's position that principles of academic freedom required the recognition of a qualified privilege or the adoption of a balancing approach that would require the Commission to demonstrate some particularized need, beyond a showing of relevance, to obtain peer review materials. As is not the case here, the files had not been produced, even in redacted form.

Limiting itself to the "compelled disclosure question," the Supreme Court granted certiorari because of the importance of the issue and because of what might be thought of as a conflict in approach with the Seventh Circuit's decision in *Notre Dame.* Notably, though, the Third Circuit had not ruled on the question of whether the university could redact records before producing them, since the district court had not considered the issue. 493 U.S. at 187 n. 2. 110 S.Ct. at 581 n. 2.

Addressing the university's claim that a common law privilege protected its peer review records, the Supreme Court concluded that there was no historical or statutory basis for the university's claim of privilege. *See id.* at 188–196, 110 S.Ct. at 582–585. After looking to legislative history and the extension of Title VII to educational institutions, the Court concluded that EEOC should be granted access to peer review materials upon a showing of relevance. *Id.* at 194, 110 S.Ct. at 584. The Court noted that Congress had balanced EEOC's right of access to relevant evidence against employers' interest in the confidentiality of records. Ultimately, it had provided a modicum of protection by enacting § 2000e-8, which makes it unlawful for any EEOC officer or employee to make public in any manner whatever any information obtained by EEOC "prior to the institution of any proceeding" under Title VII. *Id.* at 188–194, 110 S.Ct. at 583–584.

The Court characterized the university's claim of infringement of First Amendment rights as an argument that "disclosure undermines the confidentiality which is central to the peer review process, and this in turn is central to the tenure process, which in turn is the means by which petitioner seeks to exercise its asserted academic-freedom right of choosing who will teach." *Id.* at 199–200, 110 S.Ct. at 587–588. In effect, the university contended that disclosure of peer review materials makes it more difficult to acquire information from reviewers regarding the academic grounds on which to base tenure decisions. *Id.* at 200, 110 S.Ct. at 588.

Having thus articulated the university's contention, the Court expressed its doubts that the peer review process was more essential in effectuating an educational institution's right to determine "who may teach" than were other factors, such as the availability of money to bid for professors. *Id.* Besides finding the claimed injury to academic freedom "remote and attenuated," the Court found it speculative. *Id.* Confidentiality was not the norm in all peer review systems, and the absence of a privilege would not completely "chill" comments by peers. In the Court's words,

> ... we are not so ready as petitioner seems to be to assume the worst about those in the academic community. Although it is possible that some evaluators may become less candid as the possibility of disclosure increases, others may simply ground their evaluations in specific examples and illustrations in order to deflect potential claims of bias or unfairness. Not all academics will hesitate to stand up and be counted when they evaluate their peers.

*Id.* In the circumstances before it, the Court found that the EEOC subpoena process did not infringe any First Amendment right. *Id.* at 201, 110 S.Ct. at 589.

In *EEOC v. University of Notre Dame Du Lac,* 715 F.2d 331 (7th Cir.1983), the Seventh Circuit considered whether academic institutions are protected against compelled disclosure of the names and identities of persons providing peer review evaluations as part of the process for granting or denying tenure. A district court in that case had ordered enforcement of an EEOC administrative subpoena *duces tecum* requiring the production of certain faculty member files in the respondent university's Department of Economics. While not arguing that the files should not be produced in any circumstances, the university contended that peer review evaluations within those files were protected from disclosure by a qualified academic privilege. The University was willing to produce files, but it wanted to do so in redacted form. More specifically, the university contended that it should be permitted to delete the names and any and all information identifying the academicians who had participated in the peer review process before giving the files to EEOC. *Id.* at 335.

On appeal, after the district court refused to allow the redaction, the Seventh Circuit reversed. The *Notre Dame* court commenced its analysis by looking to the flexibility given courts under Fed.R.Evid. 501 to develop rules of privilege on a case-to-case basis. *Id.* at 335. "A determination of whether to recognize an evidentiary privilege requires a balancing of competing policies." *Id.* Looking to the competing interests at stake, the court of appeals determined that confidentiality was critical in the faculty tenure selection process. *Id.* at 336–337. While recognizing that an academic privilege should not be available to hide discrimination or frustrate EEOC investigative powers, and that important interests of academic excellence might be frustrated if tenure decisions could be made other than on lawful grounds, the court found a paramount interest in protecting against the disclosure of the names and identities of persons participating in the peer review process. *Id.* at 337. In so holding, the court commented that it was "reaffirming long-standing policies of academic institutions." *Id.*

The privilege recognized in *Notre Dame* was nonetheless qualified, rather than absolute. Thus, the court went on to discuss circumstances in which a showing of "particularized need" would overcome the protection of the qualified academic freedom privilege. *Id.* at 338–339. Under that standard, a party's need would vary in proportion to the degree of access he had to other sources of

information. *Id.* at 338. As an example, if a university contended that a candidate was denied tenure based on peer evaluations and the EEOC was able to make a showing that the evaluation was not supported by legitimate non-discriminatory reasons, or that an evaluator was likely to have displayed discriminatory animus against the candidate or other individuals, disclosure of the evaluator's identity might be warranted. *Id.* at 339. EEOC could make such a showing on a document-by-document basis after having been provided with redacted files. *Id.* at 338.

■ In this case, plaintiff has pointed to no bias or evidence of discrimination in particular reports. Instead, a critical aspect of her claim is her belief that she was subjected to a disproportionately exacting review process because the *ad hoc* committee chose peer reviewers other than those she had requested. Plaintiff believes that male candidates were not subjected by the same treatment, in part because their selection of peer reviewers was honored. Plaintiff is also concerned that those involved in her second review were influenced by the adverse results on her first peer review. As defendant points out, though, at least in the case of its personnel, it is unlikely faculty reviewers would not have known of the first review.

Having reviewed the *University of Pennsylvania* decision, this court agrees that its strong language seriously undermines defendant's argument that confidentiality is essential to protect its academic freedom to decide who will teach there. Several factors weigh in favor of the discovery plaintiff seeks. First, the court agrees that the identity of plaintiff's peer reviewers, as well as that of other candidates' peer reviewers, is relevant to her claim of disparate treatment. Also, the identity of these reviewers is within defendant's control. On the other hand, the court bears in mind that the *ad hoc* committee apparently makes only one of several recommendations forwarded to the Dean. Its work is no doubt important, as the committee's choice of peer reviewers determines whose evaluations will be considered by University faculty, but there is no evidence that the *ad hoc* committee's recommendation is given greater weight than that of the FPRC or the vote of the School's tenured faculty. The identities of those other faculty members making recommendations are known to plaintiff.

The question of redaction of tenure review files is, in this court's view, not conclusively resolved by the *University of Pennsylvania* decision. Contrary to plaintiff's suggestion, the decision merely states that some "might" perceive that *Notre Dame* was in conflict with other circuits. While neither side has cited decisions rendered after the Supreme Court's decision that address the redaction issue, the court of appeals in *University of Pennsylvania* remanded for consideration of whether documents should be redacted. 850 F.2d 969, 982 (3d Cir.1988). In at least one other decision, the parties agreed that redaction was appropriate. *EEOC v. Franklin and Marshal College,* 775 F.2d 110, 117 (3d Cir.1985), *cert. denied,* 476 U.S. 1163, 106 S.Ct. 2288, 90 L.Ed.2d 729 (1986).

This court cannot conclude that the finding of no privilege in *University of Pennsylvania* obviates the various confidentiality concerns addressed in *Notre Dame* and the other decisions cited by the parties. However, depending on whether the information sought is the identity of a peer reviewer or *ad hoc* committee member, the court's conclusion on redaction varies. Also, different relevancy and confidentiality concerns come into play in the case of tenure candidates other than plaintiff.

In the case of plaintiff's peer reviewers, based on the reviewers' apparent lack of objection, and the decision in *University of Pennsylvania,* this court believes that disclosure of their identities is appropriate. However, this court would impose some limitation on the disclosure of peer reviewer identities in the case of other tenure candidates, as those reviewers apparently have had no notice of this suit and most provided their evaluations at a time when Seventh Circuit precedent would have provided an expectation that their comments would remain confidential. Defendant is ordered to provide plaintiff with unredacted copies of her own peer reviews, including transcriptions of oral interviews. In the case of other candidates, the court will allow an alternative form of disclosure. Defendant is to provide, with respect to each candidate, the following infor-

mation: (1) the identity of peer reviewers requested by the candidate; and (2) the identity of peer reviewers chosen by the *ad hoc* committee. At the present, plaintiff has not demonstrated a need to know the identities the authors of particular peer reviews within other candidates' files.[2]

■ Looking to *ad hoc* committee members, this court bears in mind that compelled disclosure of their identities potentially undermines the working relationship plaintiff might have with faculty members if she prevails in this lawsuit and is granted tenure. As already noted, *ad hoc* committee members are also only one group of faculty members making recommendations. Instead of ordering disclosure of their identities, the court will require that defendant identify the peer reviewers notified by members of the *ad hoc* committee. Should comparison of defendant's response with plaintiff's request for reviewers indicate some irregularity or bias in the selection,[3] or if plaintiff is later in a position to make a stronger showing of particularized need, the court will consider requiring that the committee members' identities be disclosed.

## CONCLUSION

For the reasons set forth above, plaintiff's motion to compel is granted in part. Compliance is to be within 30 days of this order.[4]

**2.** It is not presently apparent to this court that plaintiff would need to contact the peer reviewers of other candidates in order to prepare her case. As defendant points out, any comparison of tenure candidates' qualifications is made difficult by the fact that different candidates have different areas of expertise and specialties. Also, there are bound to be differences of opinion on scholarly merit and achievement. In-depth analysis of other candidates' qualifications potentially enmeshes the case in a morass of information only tangentially relevant.

At the present, it is reasonable to assume that plaintiff would not try to second-guess the evaluations of other candidates' peer reviewers in an effort to prove that less qualified individuals were granted tenure. Rather, it would seem more likely that she would focus on irregularity or irrationality in the way University faculty reviewers used the information before them.

Plaintiff does not need to know the names on particular reviews in other candidates' files to do that.

**3.** Plaintiff states that she needs to know the qualifications and expertise of the committee, presumably because it would impact on the selection of peer reviewers, or on the way committee members weighed and considered peer reviewers' comments. The professional qualifications of committee members is not at issue in this litigation, however. It would further seem that inadequacies or bias in the committee's evaluation could be discerned from a comparison of the peer review letters with the committee's report.

**4.** If plaintiff has previously paid for copies of redacted documents, she may return the redacted copies to defendant and defendant should provide complete copies at its expense.