[No. H002347. Sixth Dist. Jan. 9, 1987.]

HAROLD KAHN, Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
IVOR DAVIES, Real Party in Interest.

754

COUNSEL

Jerome B. Falk, Jr., Steven L. Mayer, Marla J. Miller, Howard, Rice, Nemerovski, Canady, Robertson & Falk, John Schwartz and Iris Brest for Petitioner.

No appearance for Respondent.

Paul N. McCloskey, Jr., Peter P. Chen, Brobeck, Phleger & Harrison and Marc H. Greenberg for Real Party in Interest.

**OPINION**

**BRAUER, J.**—Petitioner Harold Kahn, a tenured professor of history at Stanford University, seeks an extraordinary writ to prevent the taking of his deposition. He claims a privilege founded on the concept of academic freedom. The principal question before us is this: When a university faculty department meets in private to consider an academic appointment or tenure issue, is the candidate entitled to discover the votes cast, the underlying motivation and the comments made during the meeting? Our answer is no, unless the candidate can demonstrate some compelling state or national interest which requires disclosure. Accordingly, having given appropriate notice to both sides, we issue a peremptory writ of mandate. (*Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 177-178 [203 Cal.Rptr. 626, 681 P.2d 893]; Code Civ. Proc., § 1088.)

## I.

The real party in interest, Ivor Davies,[1] is a citizen of Great Britain, a tenured professor of history at the University of London, and a Fellow of the Royal Historical Society. He has an international reputation as a scholar and author who specializes in the history of Eastern Europe and of Poland in particular. Among his other accomplishments, Professor Davies has authored a book entitled Heart of Europe: A Short History of Poland (1984, Oxford Univ. Press), which in 1985 earned a place in the New York Times Book Review annual list of best books in the history category.

On May 14, 1985, Davies was appointed a visiting professor of history at Stanford University. The appointment was to last one academic year, i.e., from September 1, 1985, until August 31, 1986. Professor Davies was being considered for a permanent appointment to Stanford's McDonnell Chair of East European History, a chair which had been vacant for some years.

In accord with established Stanford procedures, a search committee was appointed to evaluate Davies as a candidate for the chair. The search committee consisted of three tenured professors of the Stanford History Department, a graduate student in history, and a professor from the Slavic department. In a series of letters the search committee requested written evaluations of Davies from other scholars in his field and from students.

---

[1] Professor Davies's full name apparently is Ivor Norman Richard Davies. In the court below both the title of his complaint and the verification thereto bear the name "Ivor Davies," as does his declaration in opposition to petitioner's demurrer to the complaint. But in numerous pieces of correspondence in the record, he signed his name "Norman Davies." His work entitled God's Playground: A History of Poland (2 vols., 1982, Colum. Univ. Press) is published in the United States under the name of Norman Davies.

Each of the letters assured the recipient that "your comments will be held in the strictest confidence." The search committee also undertook an evaluation of Davies's scholarly works. At a meeting of the history department held on January 8, 1986, the search committee unanimously recommended that Davies be appointed to the endowed chair.

It was the practice of the history department, after receiving the search committee's recommendation, to hold a second meeting to vote on the candidate's appointment. In this instance that meeting took place on January 15, 1986. The minutes of the meeting, after listing the names of those present, said this: "[¶] The department failed to endorse the recommendation of the East European search committee to appoint Norman Davies. The vote was 12 against the appointment, 11 in favor and 1 abstention." Petitioner, Professor Harold Kahn, was one of those present at the meeting.

Davies thereafter made circumspect inquiries to find out what had been said at the second meeting. To this end he wrote a number of letters to, and had various conversations with, persons who had either attended the second meeting or knew somone who had. From the bits of information he gathered, Davies apparently came to the conclusion that petitioner Kahn had persuaded the history department to deny the appointment, and on non-academic grounds.

On April 18, 1986, Davies met with Stanford's Provost, and asked for an explanation of the denial of his appointment. The Provost promised to provide Davies, within a week's time, a written summary of the grounds for the decision. The summary did not arrive within a week, and so on April 28, 1986, Davies commenced a civil action in the superior court, naming Kahn and 30 Does as defendants.[2]

Before discussing the suit itself, we pause to note that the Provost did in fact furnish Davies with a written summary of the reasons for the faculty decision. The document was dated May 2, 1986, and ran to seven single-spaced typewritten pages. The summary described the topics presented by the search committee in its presentation to the history department at the January 8 meeting. It recounted the search committee's evaluation of Davies's published works, it included short quotations from several letters of reference (without identifying the author), and it set forth the committee's evaluation of Davies's teaching. The summary also devoted three pages to a description of the events of the January 15 meeting. Included were both

---

[2]During this period Davies was out of the state for speaking engagements. According to Davies, he had instructed his lawyers not to file any suit until the Provost's letter of explanation had been received. But counsel felt that if the suit was not filed by the end of April, there would be difficulty in securing depositions before the end of the academic year.

favorable and unfavorable comments made by history department members (again, the identities of the speakers were not revealed), and a discussion of the areas in Davies's published work which drew particular criticism. The summary further detailed the responses made to the critics by Davies's supporters, and set forth the procedures used in voting. The summary concluded thus: "In your case, it is clear from my inquiries that the [History] Department's decision was a difficult and close one, but based on my investigations thus far, I have discovered no evidence that improper procedures were followed or that inappropriate criteria were brought to bear. On the contrary, the indications are that proper scholarly judgment formed the basis for the Department's decision."

## II.

Davies's initial complaint contained two causes of action, one for "Defamation" and the other for "Tortious Interference With Advantageous Business Relationship." The first cause alleged on information and belief that on January 15, 1986, the defendants (i.e., Kahn and the 30 Does) "made false and derogatory statements to employees of the Stanford history department, alleging that plaintiff's scholarship was defective; such statements carried a defamatory meaning and were slanderous per se in that they were uttered to professional scholars who understood them to mean that plaintiff was generally unqualified in those respects which plaintiff's profession requires: to wit, the scholarly and unbiased research, writing and teaching of Eastern European History." The second cause alleged, also on information and belief, that the defendants "conspired and acted to interfere with and terminate plaintiff's advantageous business relationship with Stanford and in particular to deny to plaintiff his prospective appointment to the McDonnell Chair of Eastern European History. Said defendants carried out their conspiracy and plan by making false and derogatory statements to members of the Stanford history department about plaintiff's professional qualifications, scholarship and published writings, with the intent to convince the History Department faculty that plaintiff's nomination to the McDonnell Chair should be rejected."

Shortly after the complaint was filed Davies noticed the deposition of Kahn. Kahn responded by moving for a protective order to prevent the taking of his deposition. Contemporaneously he demurred to both causes of action set forth in the complaint, on the ground that no cause of action had been stated. The motion and the demurrer were heard and argued on the same date, June 30, 1986. The superior court sustained the demurrer to both causes of action, and granted leave to amend. As to the protective order, the court ruled thus: "2. Defendant's motion for a protective order is granted as follows: Except as hereinafter provided all further discovery

is stayed until further order of Court pending plaintiff's amendment of his complaint and a ruling by a court of competent jurisdiction as to any further demurrer by defendant. If no demurrer is filed within 10 days following plaintiff's amendment of his complaint, then the Court's stay of discovery shall be automatically lifted. Plaintiff may, however, take the deposition of defendant Kahn for the sole purpose of inquiry into any statements he may have made, orally or in writing, as well as inquiring into his motives, actions, and conduct in connection with the review and evaluation process of plaintiff's application for tenure.

"Said deposition shall be taken, subject to the convenience of the parties and their counsel within 20 days from the date of this ruling. If said deposition is taken later than 20 days from the date of this ruling, then plaintiff's time to amend his complaint is extended one day for each day beyond said 20 day period."

Thereafter the parties stipulated that Kahn's deposition would not be taken until October 16, 1986, in order to allow Kahn to apply for an extraordinary writ. When Kahn's petition reached us we issued an order staying his deposition until further order of this court, and we requested Davies to file opposition to Kahn's petition. Davies has done so.

### III.

In a memorandum supporting his petition Kahn asserts (1) that he has a qualified privilege, founded on California's constitutional right to privacy and on the First Amendment right to academic freedom, not to disclose how he voted, or what comments he made, in the course of evaluating Davies for the appointment; (2) that the qualified privilege can only be overcome by a showing of a compelling state or national interest; (3) that in no event can Davies demonstrate such compelling interest at this time as he has not even stated a cause of action; and (4) in any event, disclosure should be prohibited because Davies already has received the Provost's summary of the review process.

In opposition Davies contends (1) that California law favors discovery, and favors the imposition of partial limitations over outright denial of discovery; (2) that under both California and federal decisions, the weight of authority favors disclosure even where a claim of academic privilege is asserted; (3) that many of the cases cited by Kahn afforded discovery to the plaintiffs; and (4) disclosure of the comments made at the January 15 meeting are of paramount importance to his case. Therefore, in Davies's view, the superior court's order was entirely correct.

We begin by examining the claimed privilege in some detail.

## IV.

The exact contours of academic freedom have not been fully delineated. In a concurring opinion in *Sweezy* v. *New Hampshire* (1957) 354 U.S. 234 [1 L.Ed.2d 1311, 77 S.Ct. 1203], Justice Felix Frankfurter said this: " '[¶] It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail "the four essential freedoms" of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.' " (*Id.,* at p. 263 [1 L.Ed.2d at p. 1332].) The quoted passage has found approval in subsequent opinions of the United States Supreme Court. (See, e.g., *Regents of University of Michigan* v. *Ewing* (1985) 474 U.S. 214, 226 [88 L.Ed.2d 523, 533 fn. 12, 106 S.Ct. 507, 514 fn. 12] (Stevens, J., writing for the court); *University of California Regents* v. *Bakke* (1978) 438 U.S. 265, 312 [57 L.Ed.2d 750, 785, 98 S.Ct. 2733] (lead opinion by Powell, J.).) That court has also suggested, albeit in contexts different from this case, that academic freedom is " 'a special concern of the First Amendment.' " (*Regents of University of Michigan* v. *Ewing, supra,* 474 U.S. at p. 226 [88 L.Ed.2d at p. 533, 106 S.Ct. at p. 514]; *University of California Regents* v. *Bakke, supra,* 438 U.S. at p. 312 [57 L.Ed.2d at p. 785]; *Keyishian* v. *Board of Regents* (1967) 385 U.S. 589, 603 [17 L.Ed.2d 629, 640-641, 87 S.Ct. 675].) But the high court has not yet addressed the extent of a university's autonomy in deciding "who may teach," nor has it said that a university faculty member has a privilege not to disclose his opinions on a matter of tenure.

When a privilege like that asserted here has been claimed in lower federal courts, divergent views have produced diverse results. The diversity stems in part from rule 501 of the Federal Rules of Evidence, which allows federal courts to develop rules of privilege on a case-by-case basis "in the light of reason and experience." (See, e.g., *Trammel* v. *United States* (1980) 445 U.S. 40, 47 [63 L.Ed.2d 186, 192-193, 100 S.Ct. 906] *E.E.O.C.* v. *University of Notre Dame Du Lac* (7th Cir. 1983) 715 F.2d 331, 334-335; *Zaustinsky* v. *University of California* (N.D. Cal. 1983) 96 F.R.D. 622, 624.) Of course, reasonable minds may differ as to "the light of reason and experience." In addition the reported cases reveal an acute variance in philosophy. For example:

*In re Dinnan* (5th Cir. 1981) 661 F.2d 426, cert. den. (1982) *sub nom. Dinnan* v. *Blaubergs* in 457 U.S. 1106 [73 L.Ed.2d 1314, 102 S.Ct. 2904], was a case in which the plaintiff claimed that she had been unlawfully denied promotion to the rank of associate professor because of sex discrimination.

She brought suit against the Regents of the University of Georgia and others, and she took the deposition of Professor Dinnan, who had served on the committee which had reviewed her application for promotion. At the deposition Dinnan was asked how he had voted; he refused to answer. The plaintiff obtained a court order compelling Dinnan to answer, but when the deposition resumed Dinnan reiterated his refusal to reply to any question regarding his vote. The district court held Dinnan in contempt. On appeal Dinnan contended, among other things, that he was entitled to withhold information because he was protected by the " 'academic freedom privilege.' " (*Id.,* at p. 427.) The court of appeals flatly rejected the asserted privilege, and affirmed the rulings of the lower court. In its opinion the appellate court said this:

"The appellant is frustrating the appellee's attempt to vindicate an alleged infringement of her statutory and constitutional rights. Though the case is one involving an alleged case of sex discrimination, admittedly a cause of action not especially favored by some groups at the present time, its implications are staggering. Using the appellant's logic, if a tenure committee attempted to stop the promotion of all faculty members who were not pro-abortionists, a right-to-life music professor's attempt at discovery could be barred by the concept of 'academic freedom.' Likewise, a physician's application might be sabotaged because he opposed the cession of the Panama Canal where such a position was not favored by the committee. In all these cases, 'academic freedom' would shield the tenure committee from having to reveal its votes, even though the decision had nothing to do with any academic grounds. In every one of these scenarios, the rights of the applicant would be infringed upon, but 'academic freedom' would serve to obstruct the vindication of these rights. This possibility is a much greater threat to our liberty and academic freedom than the compulsion of discovery in the instant case.

"Though we recognize the importance of academic freedom, we must also recognize its limits. The public policy of the United States prohibits discrimination; Professor Dinnan and the University of Georgia are not above that policy. To rule otherwise would mean that the concept of academic freedom would give any institution of higher learning a *carte blanche* to practice discrimination of all types." (*Id.,* at p. 431.)

In *E.E.O.C.* v. *Franklin & Marshall College* (3d Cir. 1985) 775 F.2d 110, cert den. (1982) 476 U.S. 1163 [90 L.Ed.2d 729, 106 S.Ct. 2288], an assistant professor of French was denied tenure. He filed a charge of discrimination with the Equal Employment Opportunity Commission. The commission issued a subpoena duces tecum requiring the college to produce, among other things, tenure recommendation forms prepared by faculty members, annual

evaluations, letters of reference, and evaluations of publications made by outside experts. The college refused to comply. The district court ordered compliance. On appeal the college urged the court of appeals to recognize a qualified academic peer review privilege, which would prevent disclosure of confidential peer review material. That court refused to do so, saying "[w]e decline to follow the Seventh and Second Circuits in recognizing either a qualified academic privilege or in adopting a balancing approach." (*Id.*, at p. 114.) The court examined the history of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), and concluded that the history permitted no inference "that Congress intended or would permit academic institutions to bar the EEOC's access to material relevant to an investigation." (*Id.*, at p. 115.) The court's summation of the issue was this:

"We are not unmindful of nor insensitive to the importance of confidentiality in the peer review process, especially for institutions of the size and character of the appellant college and the *amici curiae*. We recognize that permitting disclosure to the EEOC of confidential peer review material may perhaps burden the tenure review process in our nation's universities and colleges. In the face of the clear mandate from Congress which identified and recognized the threat of unchecked discrimination in education, however, we have no choice but to trust that the honesty and integrity of the tenured reviewers in evaluation decisions will overcome feelings of discomfort and embarrassment and will outlast the demise of absolute confidentiality." (*Id.*, at p. 115.)

In sharp contrast to the foregoing decision is the opinion in *E.E.O.C.* v. *University of Notre Dame Du Lac, supra,* 715 F.2d 331. There an assistant professor of economics was denied tenure, and he filed a complaint with the Equal Employment Opportunity Commission alleging that the university had unlawfully discriminated against him on the basis of race. The commission issued a subpoena duces tecum requiring the university to produce, among other things, the complete personnel records of the complainant and of all other teaching personnel in the economics department. The university did not comply. The commission obtained a district court order for compliance. The university appealed, and argued that before disclosure it should be allowed "to delete from the files the names and any and all identifying features of the academicians who participated in the respective tenure peer reviews." (*Id.*, at p. 335.) In other words, the University asserted only a qualified privilege, rather than an absolute privilege. In considering the question the court of appeals sought to balance the competing interests of both sides. We quote from its opinion:

"It is clear that the peer review process is essential to the very lifeblood and heartbeat of academic excellence and plays a most vital role in the proper

and efficient functioning of our nation's colleges and universities. The process of peer evaluation has evolved as the best and most reliable method of promoting academic excellence and freedom by assuring that faculty tenure decisions will be made objectively on the basis of frank and unrestrained critiques and discussions of a candidate's academic qualifications. [Citation.] Moreover, it is evident that confidentiality is absolutely essential to the proper functioning of the faculty tenure review process. The tenure review process requires that written and oral evaluations submitted by academicians be completely candid, critical, objective and thorough in order that the University might grant tenure only to the most qualified candidates based on merit and ability to work effectively with colleagues, students and the administration. For these reasons academicians who are selected to evaluate their peers for tenure have, since the inception of the academic tenure concept, been assured that their critiques and discussions will remain confidential. Without this assurance of confidentiality, academicians will be reluctant to offer candid and frank evaluations in the future." (*Id.,* at p. 336.) "[¶] There are, however, factors weighing in favor of disclosure of some of the contents of the peer review files. If an academic freedom privilege could be used to totally prohibit disclosure of tenure review records, the privilege could be used as a shield to hide evidence of discrimination. The integrity of the truth-seeking process would be impaired and Congress' goal of eradicating discrimination would be frustrated. [Citation.] Likewise the EEOC's investigatory powers must not be frustrated in order that it might substantiate meritorious claims and conciliate when appropriate, and reject non-meritorious claims. Moreover, the important interests of academic excellence might well be frustrated if tenure decisions were allowed to be made on other than lawful grounds. [¶] It is clear that both parties before us have significant and substantial interests at stake. After weighing the respective interests, we recognize in this case a qualified academic freedom privilege protecting academic institutions against the disclosure of the names and identities of persons participating in the peer review process thereby reaffirming long-standing policies of academic institutions." (*Id.,* at p. 337, fn. omitted.)

Accordingly, before disclosure to the commission the university was permitted to delete from its files all material which could be used to identify any academician who furnished a peer evaluation. (*Id.,* at p. 338.) The circuit court also held that if the commission sought further information, it would have to demonstrate a "particularized need" for disclosure of such information. (*Id.,* at pp. 338-339.)

In *Gray* v. *Board of Higher Educ., City of New York* (2d Cir. 1982) 692 F.2d 901 a black instructor was denied promotion by a city university system. He requested a statement of reasons for the denial, but none was

given. He then sued the university system and certain named defendants, alleging racial discrimination under 42 United States Code sections 1981, 1983, and 1985. In the course of his lawsuit the instructor sought to take the depositions of two educators who had participated in the denial of promotion, to find out how they had voted. The educators refused to answer questions and moved for a protective order. The district court ruled that the depositions should not be taken. The court of appeals reversed that decision, and permitted the depositions to be taken. In its opinion the court refused to adopt a rule of privilege (*id.*, at p. 904), but it nevertheless weighed the competing interests of the parties (*id.*, at pp. 904-905). The court cited with approval the American Association of University Professors 1971 Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments, which "concludes that faculty members, upon request, should be informed in writing of the reasons for a decision against reappointment." (*Id.*, at p. 907.) The plaintiff had not been given a written statement of reasons, and it was that fact which tipped the scales in favor of disclosure. This is what the circuit court said:

"Rather than adopting a rule of absolute disclosure, in reckless disregard of the need for confidentiality, or adopting a rule of complete privilege that would frustrate reasonable challenges to the fairness of hiring decisions, our decision today holds that absent a statement of reasons, the balance tips toward discovery and away from recognition of privilege. A policy requiring disclosure of votes in the absence of stated reasons when they have been requested permits a plaintiff a fair opportunity to uncover evidence necessary to establishing a prima facie case of discrimination. But unlike a rule of complete disclosure, the discovery permitted in this case will not chill peer review decisions. Future decisions supported by a detailed statement of reasons given to the faculty member on request will be shielded from routine discovery. *Past* peer review decisions for which no reasons were given may be discoverable, but they have already been made and the internal workings of those decisions can not be affected at all by our adoption of the AAUP position. Thus, colleges and universities lose none of the benefits of the candor that informed those decisions." (*Id.*, at p. 908, italics in original.)

In *Zaustinsky* v. *University of California, supra,* 96 F.R.D. 622 a tenured music professor was denied promotion. She sued the university, alleging that she had been discriminated against because of her sex. Before trial she moved to compel discovery of her own personnel file and the files of seven comparable males. Initially the district court granted discovery. The university moved for reconsideration of the order. On reconsideration, acknowledging that academic files may be privileged, the district court balanced the need of the university for confidentiality and the need of the plaintiff to secure evidence of discrimination. Among other things the court said this:

"In approaching this task, the first consideration should be that a plaintiff claiming discriminatory treatment ought not to be entitled to a general inquisition into the University's files merely on the strength of having filed a complaint. Thus, plaintiff must first demonstrate, at some stage of discovery, his or her ability to establish a prima facie case. [Citation.] If it appears at that stage that plaintiff can probably make a prima facie case, the defendant must disclose the reasons for its actions and supporting evidence. To the extent those reasons are based on materials in the University's files which it regards as confidential, some disclosure must then be required which is adequate to enable plaintiff to attempt to meet the burden of proving those reasons to be pretextual. In the first instance, that disclosure should be in the form of 'a written statement of the reasons for [defendant's] decision, including a comprehensive summary in writing of the substance of confidential documents in such records.' If after that production it appears that the material produced does not fully reflect the basis for the University's action or for its defense of the case, the Court must determine the extent to which the University's position implicates other confidential and undisclosed material. Whether additional production should then be required, or whether an appropriate preclusion order should be imposed on the University, will turn on a final balancing of the relative prejudice and injury to the parties in the light of the record at that time." (*Id.,* at pp. 625-626, fn. omitted.)

The court ordered the university to produce a written statement of its reasons for denying promotion to the plaintiff, and a comprehensive summary of the substance of confidential documents in the plaintiff's own personnel file. The court did *not* order production of the personnel files themselves.

Despite differences in reasoning and result, the foregoing decisions have one element in common. In each case the plaintiff claimed *discrimination,* either on the basis of race or on the basis of sex. "In the Civil Rights Act of 1964, 42 U.S.C. § 2000a *et seq.,* Congress indicated that it considered the policy against discrimination to be of the 'highest priority.' " (*Alexander* v. *Gardner-Denver Co.* (1974) 415 U.S. 36, 47 [39 L.Ed.2d 147, 158, 94 S.Ct. 1011].) And in a different context, the United States Supreme Court has recently emphasized the same point. (*Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712]; *Vasquez* v. *Hillery* (1986) 474 U.S. 254, 263, 264 [88 L.Ed.2d 598, 608, 609, 106 S.Ct. 617].) The cases discussed in this part illustrate that when pitted against legislation of the "highest priority," the academic privilege has sometimes prevailed and sometimes not.

## V.

Unlike federal courts, California courts are not accorded the luxury of creating privileges. It is the general rule in California that there is no privilege

to refuse to disclose any matter, or to refuse to produce any writing, object, or thing, unless the privilege is created by statute. (Evid. Code, § 911, subd. (b).)

There is, however, a constitutional right to privacy. Article I, section 1, of the California Constitution states: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, *and privacy*." (Italics added.) This "inalienable right" is a "fundamental interest" of our society. (*City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123, 130 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219]; *White* v. *Davis* (1975) 13 Cal.3d 757, 774-775 [120 Cal.Rptr. 94, 533 P.2d 222].) The right to privacy is not absolute, but it may be abridged only when there is a compelling and opposing state interest. (*People* v. *Stritzinger* (1983) 34 Cal.3d 505, 511 [194 Cal.Rptr. 431, 668 P.2d 738]; *Britt* v. *Superior Court* (1978) 20 Cal.3d 844, 855 [143 Cal.Rptr. 695, 574 P.2d 766].)

One such "compelling" state interest lies in " 'facilitating the ascertainment of truth in connection with legal proceedings.' " (*Britt* v. *Superior Court, supra,* 20 Cal.3d at p. 857; *In re Lifschutz* (1970) 2 Cal.3d 415, 432 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1].)

The "compelling" state interest in discovery met head-on with the "fundamental right" of privacy in *Board of Trustees* v. *Superior Court* (*Dong*) (1981) 119 Cal.App.3d 516 [174 Cal.Rptr. 160], a case involving Stanford University. In that case two faculty members of Stanford's school of medicine, Dr. Dong and Dr. Lucas, engaged in an internal quarrel for more than five years. Each accused the other of misconduct. Various university committees investigated the complaints, as did the Department of Health, Education and Welfare. Ultimately Dr. Lucas was suspended without pay for three months; no action was taken against Dr. Dong. Thereafter Dr. Dong sued Stanford and various named professors alleging, among other things, " 'libel, conspiracy to defame, conspiracy to place plaintiff in false light . . . .' " (*Id.,* at p. 523.) Prior to trial Dr. Dong demanded to inspect and copy (1) the personnel, tenure, and promotion files of Dr. Lucas; (2) all documents regarding the research of Dr. Lucas; (3) all documents compiled by university committees in their investigation of Dr. Dong himself; and (4) the personnel, tenure, and promotion files of Dr. Dong himself. (*Id.,* at p. 524.) The trial court allowed partial discovery. The board of trustees sought a writ of mandate, and the Court of Appeal issued one. The appellate court denied disclosure of Dr. Lucas's files on the ground that there was no "compelling state interest" in such disclosure. (*Id.,* at pp. 526-527.) It also denied disclosure of the university committee files concerning the investigation of Dr.

Dong, on the ground that since those committees had found no misconduct on Dong's part, those files bore no relevance to Dr. Dong's lawsuit. (*Id.,* at pp. 527-528.) But the court nevertheless allowed Dr. Dong to obtain his own personnel file, with the identities of contributors thereto redacted. "[¶] We accordingly hold that Dr. Dong is entitled to discovery of his personnel file, subject to appropriate safeguarding of the rights of privacy of those who had furnished information therein concerning his 'qualifications for employment, promotion, additional compensation, or termination . . . .' " (*Id.,* at p. 533.)

For our purpose two important principles can be derived from the *Dong* case. █ The first is this: "[I]t has been adjudged that inquiry into one's private affairs will *not* be constitutionally justified simply because inadmissible, and irrelevant, matter sought to be discovered *might* lead to other, and relevant, evidence. [Citation.] ' "When compelled disclosure intrudes on constitutionally protected areas, it cannot be justified solely on the ground that it may lead to relevant information.' " [Citations.] [¶] And even when discovery of private information is found directly relevant to the issues of ongoing litigation, it will not be automatically allowed; there must be a 'careful balancing' of the 'compelling public need' for discovery against the 'fundamental right of privacy.' [Citations.]" (*Id.,* at p. 525, italics in original.) The second principle is this: "It appears that such communications of the University's faculty members as were considered by the committees . . . were tendered under a guaranty of confidentiality. They were thus manifestly within the Constitution's protected area of privacy." (*Id.,* at p. 527.)

In *King* v. *Regents of University of California* (1982) 138 Cal.App.3d 812 [189 Cal.Rptr. 189] an assistant professor of Afro-American studies was denied tenure. He requested a copy of his own personnel file, and was given a summary as required by the university's regulations. He appealed to a standing committee on privilege and tenure; the committee conducted an investigation and concluded that no university policy had been violated. The professor then applied to the superior court for a writ of mandate to compel the Regents to conduct a full adversary hearing on the decision to deny him tenure, and to disclose the entire contents of his personnel file. The trial court denied relief. On appeal the professor argued, among other things, that it was "unfair to deny him access to the contents of his personnel file and yet require him to make a prima facie showing of irregularities in the tenure evaluation as a prerequisite to a formal hearing." (*Id.,* at p. 818.) The Court of Appeal reasoned that the comprehensive summary provided to the professor "has reduced the weight of appellant's need to see the entire contents of his file. The only material remaining for appellant to discover is the identity of the sources of the evaluations. These names would appear to be of little value to him, as it is the substance of their comments with which he should be

concerned. On the other hand, the names are the most important thing for the university to protect. The principle of confidentiality 'is a prerequisite to the effectiveness of a peer evaluation system of faculty selection.' [Citation.] [¶] We conclude the university's need to maintain confidentiality outweighs any marginal benefit to appellant from disclosure of the names of his evaluators. Appellant has not demonstrated a need for *total* disclosure which outweighs the university's interest in protecting its system of evaluation." (*Id.,* at pp. 819-820.)

In *McKillop* v. *Regents of University of California* (N.D. Cal. 1975) 386 F.Supp. 1270, a professor who had been denied tenure by the art department sued the university, alleging discrimination on the basis of sex. As a part of her discovery efforts, she sought to obtain (1) her own personnel file; (2) the personnel files of persons in tenure-track positions in the art department; (3) the personnel files of tenured persons in the art department; and (4) the personnel files of persons previously denied tenure by the art department. The university refused to divulge any documents submitted or written in confidence. The professor moved to compel disclosure. The district court suggested that an independent academician review the files to determine whether any implication of discrimination could be found. The professor rejected that suggestion, arguing that without full disclosure she could not proceed with her case. She indicated that she might need to depose the evaluators to determine whether they harbored any bias against women. About that notion the district court said this:

"It is highly unlikely that such depositions would be permitted. The connection between the bias of an evaluator, undetectable from the face of an evaluation, and the propriety of the actions taken by the decison makers on the basis of such an evaluation is extremely tenuous. Furthermore, to allow depositions would require that the identity of the evaluators be disclosed in addition to the text of the evaluations. Such disclosure would represent the most serious breach of the confidentiality of the tenure selection process, a breach which even proponents of limited disclosure have opposed." (*Id.,* at p. 1278, fn. omitted.) "[¶] In sum, the Court finds that on the particular facts of this case in its present posture, the University's need to preserve the confidentiality of the tenure files in question decisively outweighs the plaintiff's need for their production." (*Ibid.*)

## VI.

We turn to the case before us. In deciding it, we confront the clamor of competing claims of high dignity. If possible, such values must be accom-

modated and reconciled. If not, priorities must be set. Courts are no strangers to that task.[3]

If Professor Kahn's expressions at the faculty meeting and the motives underlying such expressions may not be inquired into, plaintiff's ability to seek redress will be impaired.

The countervailing considerations have already been alluded to. That the peer review process is central to the maintenance of academic standards and that confidentiality is indispensable to that process were eloquently proclaimed in *University of Notre Dame Du Lac, supra,* quoted in Part IV, *ante.*

Stanford emphatically concurs. Professor Paul Robinson, chairman of Stanford's History Department, filed a declaration in support of Kahn's motion for a protective order. In his declaration Robinson discussed procedures followed in academic appointments. Among other things he said this: "[¶] 7. Faculty meetings at which appointment matters are discussed are confidential. Those present are encouraged to express their views frankly, with the assurance that neither the candidate nor others within or without the University will learn the identity of those who offered particular opinions on the quality of the candidate's work. For this reason, the minutes of History Department meetings do not reflect either the substance of comments made during discussion preceding the vote on a prospective appointment, or the identities of those who spoke at the meeting."[4] ▪ It appears that the discussion and the vote were intended to be confidential, just as were the written evaluations of Davies received from outside scholars.

---

[3]Examples abound. 1) The clash between fair trial and free press. For discussion, see Alarcon, *Fair Trial vs. Free Press; Who's on First?* (1982) 14 U. of West L.A.L.R. 1; Stephenson, *Fair Trial—Free Press; Rights in Continuing Conflict* (1980) 46 Brooklyn L.R. 39. 2) The conflict between the demand of older folks for an apartment insulated from strident and raucous teenage music and the need of parents with children for greater access to housing. (*Marina Point Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161].) 3) The struggle between freedom of the press and efforts of public figures to vindicate their good names. Compare Chief Justice Bird's perception of the press as essentially fragile (*Fellows* v. *National Enquirer, Inc.* (1986) 42 Cal.3d 234, 252 [228 Cal.Rptr. 215, 721 P.2d 97]) with the in-depth analysis of the Westmoreland and Sharon libel trials in Adler, Reckless Disregard (Alfred A. Knopf, (1986)). It is the thesis of that study that even a four-star general and the Israeli foreign minister were virtually powerless when confronted with a major periodical or television network. This area of the law presents an eloquent example of the total subordination of one value to another. Because of the perceived need of the press to scrutinize, unfettered, the conduct of government officials, a public figure is essentially without remedy if defamed in the media. This deprivation has been accomplished by the confluence of several principles: the requirement of actual malice, the shield law and the appellate courts' assertion of the power to reweigh the evidence. (*New York Times Co.* v. *Sulivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412]; Evid. Code § 1070; *McCoy* v. *Hearst Corp.* (1986) 42 Cal.3d 835 [231 Cal.Rptr. 518, 727 P.2d 711].)

[4]Robinson was one of those present at the January 15 faculty meeting.

The comments made and the votes cast "were thus covered by the communicators' constitutional right of privacy." (*Board of Trustees* v. *Superior Court (Dong)*, *supra*, 119 Cal.App.3d at p. 528.)[5] The privilege is here claimed in furtherance of a policy which occupies the very highest rank. The whole purpose of the tenure review process is to enable colleges and universities to secure only the most qualified available professors for their faculties. In other words, tenure review is one form of the pursuit of academic excellence. In times such as these, the pursuit of excellence in our institutions of higher learning has educational and social implications of paramount importance. If we abandon the pursuit, we lose the objective. The lowering of standards is the ultimate sacrilege against the ascent of man.[6]

Excellence cannot be achieved unless faculty members, without fear of disclosure, are able to express candid appraisals of the qualifications of tenure candidates. If evaluators suspect that their views may be aired in litigation, they unquestionably will be less than candid in their critiques. They may perceive that the comments of their colleagues are also reserved or noncomittal. The result, instead of being a thorough evaluation of a candidate's qualifications, would be a superficial discussion in which protest is discouraged, reservations are repressed, and insights are left hidden. In such an atmosphere it is likely that candidates would seldom be denied tenure; and over a period of time the quality of the faculty would inevitably deteriorate.

This point cannot be more persuasively demonstrated than by looking at the complaint in this case. As set forth in Part II, Professor Kahn and the Does are accused of having made ". . . derogatory statements to . . . the Stanford History Department . . . that plaintiff's scholarship was defective; such statements . . . were uttered to professional scholars who understood them to mean that plaintiff was generally unqualified in those respects which plaintiff's profession requires . . . ." The message to academic evaluators is plain: issue your imprimatur or be sued.

We acknowledge that peer evaluations may provide an opportunity for abuse. In a private faculty meeting it is possible that truly defamatory statements may be made, that vilification or prejudice may overpower the thrust of reason, or that "academic freedom" may be used to shield nonacademic

---

[5] *McKillop* v. *Regents, supra*, 386 F.Supp. 1270, 1278 suggests without analysis or citation of authority that a deposition is somehow less objectionable than a disclosure of written evaluations. To the contrary, it is possible to protect the identity of an informant by excising source-identifying information from a writing. No such protection is possible in a deposition inquiring into any statements and motives of a participant in the review process. Moreover, a deposition is far more intrusive and therefore chilling.

[6] With apologies to Professor Jacob Bronowski, Ascent of Man (Little, Brown & Company, 1974).

and insidious motives for denying tenure. But in California the fostering of academic excellence finds support in the constitutional right to privacy. Consequently, even if we assume that in the odd case a candidate may be denied tenure for improper reasons, we are of the opinion that the right of a faculty member to discuss with his colleagues the candidate's qualifications thoroughly and candidly, in confidence and without fear of compelled disclosure, is of such paramount value that it ought not to be impaired.

We further acknowledge the "compelling" state interest in " 'facilitating the ascertainment of truth in connection with legal proceedings.' " (*Britt* v. *Superior Court, supra,* 20 Cal.3d at p. 857; *In re Lifschutz, supra,* 2 Cal.3d at p. 432.) Certainly Professor Davies has a right to seek redress in the courts. But his interest is only in monetary damages; it must be remembered that he has no *right* to be employed by Stanford University. (*Board of Regents* v. *Roth* (1972) 408 U.S. 564, 575, 578 [33 L.Ed.2d 548, 192 S.Ct. 2701].) Professor Kahn, on the other hand, has a constitutional right to privacy which, though not absolute, bends, if at all, only to a compelling public need. (*Board of Trustees* v. *Superior Court* (*Dong*), *supra,* 119 Cal.App.3d 516, 526.) We are required to balance these competing interests carefully. In our view the scales tip in favor of nondisclosure. ▮ The ordinary yardstick for discoverability, i.e., that the information sought may lead to relevant evidence, is not applicable when compelled disclosure would intrude on constitutionally protected areas. (*Id.* at p. 525.) ▮▮▮▮▮ The complaint in this case made no claim of discrimination on the basis of sex, religion, age, or any other ground.[7] Professor Davies already has received a comprehensive summary of the events which took place, and the reasons espoused for refusing him an appointment. To permit him to depose[8] Professor Kahn would allow "the most serious breach of the confidentiality of the tenure selection process." (*McKillop* v. *Regents of University of California, supra,* 386 F.Supp. at p. 1278), and would seriously undermine the public interest in promoting academic excellence.

---

[7] Davies himself filed a declaration in opposition to the demurrer and the motion for a protective order. In it he claimed that he had been advised by "several professors who were present or privy to the January 15 meeting" that the "bulk" of that meeting had been devoted to an attack on Davies's political views. Davies then asserted, on information and belief, that after reading chapter 9 of his book entitled God's Playground: A History of Poland, the defendants concluded "that plaintiff's political views and creed were insensitive to the Jewish political viewpoint and unacceptably defensive of the behavior of the Poles."

A declaration filed in opposition to a demurrer is "a nullity, of no purpose or effect whatever" in consideration of a demurrer. (*Allred* v. *Bekins Wide World Van Services* (1975) 45 Cal.App.3d 984, 993 [120 Cal.Rptr. 312].) Furthermore, an affidavit which is based on "information and belief" is hearsay and must be disregarded, and it is " 'unavailing for any purpose' whatsoever . . . ." (*Star Motor Imports, Inc.* v. *Superior Court* (1979) 88 Cal.App.3d 201, 204 [151 Cal.Rptr. 721].)

[8] We do not suggest that discovery is precluded as to nonprivileged matters.

## VII.

Let a peremptory writ of mandate issue, with directions to the superior court to set aside that portion of its order, filed August 26, 1986, in the above-entitled cause, which allows Professor Davies to take the deposition of Professor Kahn.

Agliano, P. J., and Capaccioli, J., concurred

A petition for a rehearing was denied February 4, 1987, and the petition of real party in interest for review by the Supreme Court was denied March 26, 1987.