[No. B092343. Second Dist., Div. Two. May 31, 1996.]

POMONA COLLEGE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
ANDREW CORIN, Real Party in Interest.

**COUNSEL**

Sidley & Austin, James M. Harris, Ronald C. Cohen and Robert A. Holland for Petitioner.

Sandra A. Cooper and Robert G. Lane as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Michelle A. Reinglass and Vickie Lynn Bibro for Real Party in Interest.

**OPINION**

**BOREN, P. J.**—Petitioner, Pomona College, seeks a writ of mandate directing the superior court to set aside its order overruling Pomona's demurrer to the complaint of real party Andrew Corin.

Corin filed a complaint for damages, claiming wrongful termination and breach of contract and of implied covenants after Pomona declined to offer him lifetime academic tenure as a college professor. Pomona demurred on the ground that Corin's exclusive remedy is administrative mandamus review under Code of Civil Procedure section 1094.5.[1] We conclude that mandamus review is the exclusive remedy and that the superior court should have sustained without leave to amend Pomona's demurrer to Corin's operative complaint. We therefore grant the writ.

## I. Factual and Procedural Background

Pomona employed Corin as an assistant professor in the department of modern languages and literature from March 1987 to July 1994. (His chosen field of scholarship is Serbo-Croatian linguistics—historical as well as synchronic-descriptive—and philological research, with a particular emphasis on Old Church Slavonic. Corin taught courses primarily in Russian language and historical linguistics.)

Upon learning that he would not be offered lifetime tenure, Corin filed suit, claiming that in 1987 Pomona promised him a permanent teaching position as long as his performance was "acceptable" and in accordance with the "guidelines" and "policies" as outlined in Pomona's faculty handbook (Handbook). He alleges Pomona breached these promises by failing to follow its policies and procedures during the tenure review process. Specifically, Pomona improperly evaluated his teaching, scholarship and service, improperly gave unfair and inappropriate weight to certain evidence presented to Pomona for consideration in the tenure review process, provided improper and inadequate counseling throughout the tenure evaluation process, improperly changed the standards for awarding tenure only as to Corin, without notice or opportunity to be heard by Corin, and failed to adequately define the official role of the linguistics department in the tenure granting process.

Pomona demurred to Corin's complaint on the ground that his exclusive remedy for the wrongs he alleges is administrative mandamus review under section 1094.5. The superior court overruled the demurrer, stating "[t]he [c]ourt finds that this is a strictly [b]reach of [c]ontract lawsuit." This petition for writ of mandate followed.

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

## II.  DISCUSSION

### A.  *Contentions*

■■  Pomona contends that section 1094.5 should be extended to review quasi-judicial decisions of private universities, and that because Corin seeks de novo reevaluation of his lifetime tenure candidacy, administrative mandamus is his exclusive remedy.

Although Corin concedes that section 1094.5 has been applied to various private institutions, he claims the statute should not be applied to private universities. However, assuming we hold that it does, he claims he should not be required to avail himself of the remedy because his is a simple breach of contract claim based on Pomona's "failure to follow its established policies and procedures" during the tenure review process. Alternatively, Corin argues that he should not be required to seek mandamus because, in making its final administrative decision to deny him tenure, Pomona failed to hold a hearing regarding his grievance and failed to take evidence as required by section 1094.5.

### B.  *Standard of Review*

■■  We treat the pleadings as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. (See *Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

We independently construe statutes as a matter of law according to their purpose and intent. (*Suman* v. *BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 9 [28 Cal.Rptr.2d 133].) If there is no liability as a matter of law, leave to amend should not be granted. We consider evidence outside the pleadings which the trial court considered without objection. (*O'Neil* v. *General Security Corp.* (1992) 4 Cal.App.4th 587, 594, fn. 1 [5 Cal.Rptr.2d 712].)

### C.  *Section 1094.5*

Section 1094.5 provides, in pertinent part, that mandamus is available to review ". . . any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer."

### D. *Does Section 1094.5 Apply to Private Universities?*

■ We first examine whether section 1094.5 applies to the adjudicatory decisions of a private organization such as Pomona.[2]

■ It is now authoritatively established that section 1094.5 will apply to nongovernmental administrative agencies. In *Anton v. San Antonio Community Hosp.* (1977) 19 Cal.3d 802 [140 Cal.Rptr. 442, 567 P.2d 1162] (*Anton*), a licensed physician and surgeon brought a mandamus proceeding to compel a *private, nonprofit hospital corporation* to reappoint him to its medical staff. (*Id.* at p. 808.) Our Supreme Court declared: "It has been widely assumed that mandate review via section 1094.5 is available only with respect to administrative decisions by *governmental* agencies. However, we find nothing in the statutory language or supporting legislative materials which would lead us to accept that assumption as warranted. Section 1094.5, . . . is by its terms made applicable to '*any final administrative order or decision* made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in the *inferior tribunal, corporation, board or officer . . . .*' Clearly this language is not limited, . . . to governmental as opposed to nongovernmental agencies. Moreover, the last-italicized language appears to have been drawn directly from the terms of section 1085, dealing with so-called 'traditional mandate.' It has long been clear, of course, that section 1085 mandate is available not only to compel official acts on the part of governmental agencies *but also* to compel nongovernmental bodies or officers to perform their legal duties. It would seem to follow, therefore, that section 1094.5, by using substantially identical language in describing the kind of administrative body whose decisions are subject to review under its provisions, was intended to apply to the same spectrum of agencies to which section 1085[3] has been held applicable *in all cases in which the subject decision is the product of a proceeding in which a hearing and related procedural protections are required by law.*" (*Id.* at pp. 815-817, original italics, fns. omitted.)

Courts following *Anton* have held that section 1094.5 applies to various private institutions. (*Delta Dental Plan v. Banasky* (1994) 27 Cal.App.4th 1598, 1608 [33 Cal.Rptr.2d 381] [mandamus available to review private

[2]Amicus curiae represents that there are a total of 73 private, accredited, degree-granting colleges and universities in California whose combined enrollment is 183,000, about the size of the combined campuses of the University of California.

[3]Mandamus pursuant to section 1085 is available against a private university "to set aside the dismissal of a medical student if such dismissal was arbitrary, capricious or in bad faith." (*Valvo v. University of Southern California* (1977) 67 Cal.App.3d 887, 896 [136 Cal.Rptr. 865].)

dental plan's decision regarding fees that could be charged by participating dentists]; *Wallin* v. *Vienna Sausage Manufacturing Co.* (1984) 156 Cal.App.3d 1051, 1056 [203 Cal.Rptr. 375] [private manufacturer's decision to terminate employee pursuant to grievance procedure reviewable under section 1094.5]; *Bray* v. *International Molders & Allied Workers Union* (1984) 155 Cal.App.3d 608, 616 [202 Cal.Rptr. 269] [trade union decision to remove officer pursuant to formal hearing reviewable under section 1094.5].)

**(1c)** Bolstering our conclusion that section 1094.5 is applicable here, is that the statute has routinely been applied to public university employment decisions. For example, in *Edgren* v. *Regents of University of California* (1984) 158 Cal.App.3d 515 [205 Cal.Rptr. 6], the plaintiff, an architect, alleged the Regents of the University of California breached an employment contract with him by laying him off in violation of the Regents' personnel policies and procedures. (*Id.* at p. 519.) The Court of Appeal affirmed the trial court's order sustaining the Regents' demurrer to the complaint, concluding that the plaintiff's contract action was barred by his refusal to exhaust the Regents' internal grievance procedures. (*Id.* at p. 523.) The court also noted that once the plaintiff exhausted the internal grievance procedures, the proper means for obtaining review of the adequacy of the grievance proceedings was not a civil action, but rather an administrative mandamus proceeding under section 1094.5. (158 Cal.App.3d at p. 522; see also *Poschman* v. *Dumke* (1973) 31 Cal.App.3d 932, 938 [107 Cal.Rptr. 596] [mandamus available to review denial of tenure] disapproved on another point in *Armistead* v. *State Personnel Board* (1978) 22 Cal.3d 198, 204, fn. 3 [149 Cal.Rptr. 1, 583 P.2d 744]; *King* v. *Regents of University of California* (1982) 138 Cal.App.3d 812, 814 [189 Cal.Rptr. 189] [assistant professor sought mandate to compel the Regents of the University of California to conduct a full adversary hearing on the decision to deny him tenure].)

Corin suggests that two cases, *McGough* v. *University of San Francisco* (1989) 214 Cal.App.3d 1577 [263 Cal.Rptr. 404] and *University of Southern California* v. *Superior Court* (1990) 222 Cal.App.3d 1028 [272 Cal.Rptr. 264], provide authority for the proposition that *private* university faculty members may bring civil suits against their employers even where the requirements of section 1094.5 are met.

*McGough* was a contract action in which the plaintiff sought to enforce the terms of a collective bargaining agreement governing his employment relationship with a private university. The Court of Appeal affirmed summary judgment in favor of the university on the ground that plaintiff's contract claims were preempted by the National Labor Relations Act. (*McGough* v.

*University of San Francisco, supra,* 214 Cal.App.3d at p. 1581.) Whether administrative mandamus was available to review the plaintiff's tenure decision was neither raised by the parties nor addressed by the court.

In *University of Southern California,* a tenured associate professor brought an action against her private university employer and various university employees for breach of the implied covenant of good faith and fair dealing, employment discrimination in violation of the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) and intentional infliction of emotional distress. The university sought summary adjudication of issues, including whether the plaintiff had introduced sufficient evidence to support her claim under Government Code section 12940 that she had been denied promotion because she was a woman. (*University of Southern California* v. *Superior Court, supra,* 222 Cal.App.3d at p. 1031.) The only issue before the Court of Appeal was whether the trial court erred in denying summary adjudication on this issue. Again, neither the parties nor the court addressed the availability of administrative mandamus.[4]

### E. Public Policy

Important public policy interests are served by providing a uniform practice of judicial, rather than jury, review of quasi-judicial administrative decisions to deny lifetime academic tenure.[5]

"[T]enure decisions in an academic setting involve a combination of factors which tend to set them apart from employment decisions generally. [Citation.]" (*Zahorik* v. *Cornell University, supra,* 729 F.2d at p. 92.)

"Colleges may fail to promote or to grant tenure for a variety of reasons, such as anticipated decline in enrollment, retrenchment for budgetary reasons, termination of some departments, or determination that there are higher priorities elsewhere. These are decisions which may affect the quality of education but do not necessarily intrude upon the nature of the educational process itself. [¶] On the other hand, it is beyond cavil that generally faculty employment decisions comprehend discretionary academic determinations

---

[4]It bears emphasis that nothing decided in this case will affect or undermine the extensive body of federal law which protects tenure candidates from illegal and invidious discrimination. (See, e.g., tit. VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq.; *Kunda* v. *Muhlenberg College* (3d Cir. 1980) 621 F.2d 532; *Zahorik* v. *Cornell University* (2d Cir. 1984) 729 F.2d 85.) Corin, of course, makes no such claim.

[5]Our decision to apply section 1094.5 to the review of private college tenure decisions is in line with well-established law in New York. (See, e.g., *Romer* v. *Hobart & William Smith Colleges* (W.D.N.Y. 1994) 842 F.Supp. 703, 706-710; *Pauk* v. *Bd. of Trustees of City University* (1985) 111 A.D.2d 17 [488 N.Y.S.2d 685, 688]; *Gertler* v. *Goodgold* (1985) 107 A.D.2d 481 [487 N.Y.S.2d 565, 569-570].)

which . . . entail review of the intellectual work product of the candidate. That decision is most effectively made within the university and although there may be tension between the faculty and the administration on their relative roles and responsibilities, it is generally acknowledged that the faculty has at least the initial, if not the primary, responsibility of judging candidates." (*Kunda* v. *Muhlenberg College, supra*, 621 F.2d at pp. 547-548.) "Wherever the responsibility lies within the institution, it is clear that courts must be vigilant not to intrude into that determination, and should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure. Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges." (*Id.* at p. 548.)

Such deference toward academic expertise is further warranted because the essential characteristic of tenure is continuity of service, in that the institution in which the teacher serves has relinquished the freedom or power it otherwise would possess to terminate the teacher's service.[6] (See *Zahorik* v. *Cornell University, supra*, 729 F.2d at p. 92.) This enormous commitment of subsidizing a qualified scholar's research and teaching for the rest of his or her life is how a college or university ensures freedom of teaching and research and of extramural activities, and a sufficient degree of economic security to make the profession attractive to men and women of ability. Freedom and economic security, hence, tenure, are indispensable to the success of an educational institution in fulfilling its obligations to its students and to society. (American Association of University Professors, The 1915 Declaration of Principles, reprinted in Joughin, Academic Freedom and Tenure (U. Wis. Press 1967) appen., p. 155.)

These purposes of tenure can be fulfilled only if the individuals selected to receive tenure in fact possess the intellectual and personal qualifications to carry out the institution's essential missions of research and instruction. Those granted tenure define the intellectual character of the institution for decades after their selection.[7] The determination each year of who should receive tenure thus has the potential either to greatly enrich the institution and its students or to jeopardize the institution's very existence.

[6]We do not mean to suggest a tenured teacher is immune from termination. Discharge would be appropriate, for example, in situations of demonstrated incompetence or dishonesty in teaching or research, substantial and manifest neglect of duty, and personal conduct which substantially impairs the individual's fulfillment of his institutional responsibilities.

[7]Amicus curiae points out that this phenomenon is especially true for small colleges and universities because of size and budget constraints.

Only one group of people is suited to undertake the responsibility of making these decisions: the candidate's academic peers who are knowledgeable about the candidate's chosen field of study and about the particular needs of the institution. These peers, unlike nonacademics, are equipped to evaluate the candidate's teaching and research according to their conformity with methodological principles agreed upon by the entire academic community.[8] They also have the knowledge to meaningfully evaluate the candidate's contributions within his or her particular field of study as well as the relevance of those contributions to the goals of the particular institution. Moreover, because their individual academic reputations are intertwined with that of the university, the candidate's peers have the greatest stake in choosing people whose future work will reflect favorably on the institution.[9]

It is for these reasons that courts have been reluctant to review the merits of a tenure decision (*Zahorik* v. *Cornell University, supra,* 729 F.2d at p. 93), and have concluded that universities should be "free to establish departmental priorities, to set their own required levels of academic potential and achievement and to act upon the good faith judgments of their departmental faculties or reviewing authorities." (*Id.* at p. 94.)

The United States Supreme Court has recognized " ' ". . . four essential freedoms" of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.' " (*Sweezy* v. *New Hampshire* (1957) 354 U.S. 234, 263 [1 L.Ed.2d 1311, 1332, 77 S.Ct. 1203]; see also *Widmar* v. *Vincent* (1981) 454 U.S. 263, 276 [70 L.Ed.2d 440, 451-452, 102 S.Ct. 269]; *University of California Regents* v. *Bakke* (1978) 438 U.S. 265, 312 [57 L.Ed.2d 750, 785, 98 S.Ct. 2733].) Because de novo review by lay juries of the merits of tenure candidacies will severely impact these freedoms, we hold that, absent discrimination, judicial review of tenure decisions in California is limited to evaluating the fairness of the administrative hearing in an administrative mandamus action.

---

[8]Amicus curiae for the California Institute of Technology cites examples of science and engineering research—mesoscopic physics, cosmic-ray astrophysics, non-Newtonian fluids—that its highly trained faculty carefully reviews in tenure hearings.

[9]Corin suggests that litigation of his claims will not require disclosure of confidential information. Corin admits, however, that the mental processes of his peer reviewers, the committee members who reviewed his candidacy, and the grievance committee members are relevant to all of his claims. The identities of Corin's peer reviewers and their candid views and opinions expressed during the tenure review process are protected by the constitutional right to privacy. (See *Scharf* v. *Regents of University of California* (1991) 234 Cal.App.3d 1393, 1408-1409 [286 Cal.Rptr. 227].) Allowing this privacy right to be threatened by the specter of civil discovery would, in our opinion, be fatal to the proper functioning of this review process. (See *Kahn* v. *Superior Court* (1987) 188 Cal.App.3d 752, 769 [233 Cal.Rptr. 662].)

## F. *The Nature of Corin's Claims*

Corin next contends that he should be allowed to bypass the remedy set forth in section 1094.5 because he has asserted a "simple breach of contract action" based on Pomona's failure to follow its policies and procedures during the tenure review process. Corin alleges that these procedural deficiencies resulted in his "wrongful termination."

Corin's assertion that the deficiencies in the tenure review process are procedural rather than substantive is a purely semantic distinction without a difference. Litigating whether Pomona gave appropriate "weight" to the available evidence and "improperly evaluated" Corin's academic qualifications and accomplishments will necessarily require the trier of fact to evaluate de novo Corin's true abilities as a scholar. Moreover, determining whether Corin is entitled to "lost earnings" and "loss of fringe benefits" for any of the alleged deficiencies in his tenure review process will necessarily require the trier of fact to decide, again based on Corin's academic qualifications and accomplishments, whether Pomona should have granted him lifetime tenure.

California law provides to those who feel wronged by procedural defects in the tenure process—as opposed to those who disagree with substantive evaluations—a remedy. That remedy is administrative mandamus.

## G. *Did Pomona Hold a Hearing and Take Evidence?*

Corin next contends that he should not be required to avail himself of the remedy set forth in section 1094.5 because Pomona failed to hold a hearing regarding his grievance, and failed to take evidence as required by the statute.[10]

In support of its demurrer, Pomona requested that the superior court take judicial notice of the Handbook to which Corin refers in his complaint, the written employment agreement governing the terms of Corin's employment with Pomona, the written complaint which Corin submitted to the faculty

---

[10]Corin also suggests, for the first time here, that Pomona was not required "by law" to hold a hearing. Because the Handbook governed Corin's employment relationship with Pomona, the college was required by law to provide the hearing described therein. (See *Cubic Corp.* v. *Marty* (1986) 185 Cal.App.3d 438, 454 [229 Cal.Rptr. 828] [an employer is required by law to give its employees the benefit of existing company policies and procedures].) Mandamus is available if a hearing is required by statute, an organization's internal rules and regulations, or due process. (See *Keeler* v. *Superior Court* (1956) 46 Cal.2d 596, 599 [297 P.2d 967]; *Royal Convalescent Hospital, Inc.* v. *State Board of Control* (1979) 99 Cal.App.3d 788, 792 [160 Cal.Rptr. 458]; *Taylor* v. *State Personnel Bd.* (1980) 101 Cal.App.3d 498, 504 [161 Cal.Rptr. 677].)

grievance committee once he learned he would not be offered tenure, and the final report of the grievance committee upholding Pomona's decision not to grant Corin lifetime tenure. Corin made no objection to the court taking judicial notice of these items. These documents, together with Corin's complaint, describe the nature of Pomona's mandatory tenure review and grievance procedures.

### (1) Pomona's Tenure Review Process

According to the Handbook, the tenure review procedure includes several administrative steps. First, the candidate submits a "statement describing his or her professional accomplishments and goals," along with "any other material the candidate judges to be important." The relevant academic department then "reviews the material[s]," "conducts an appropriate survey of student views" and "solicits outside scholarly . . . opinion." It then prepares a "written recommendation" signed by all tenured department members, along with any dissenting views and statements.

The department recommendation and "all supporting documents" then go to the administration committee which is composed of Pomona's president (who presides but does not vote), the dean of the college, the dean of students, and nine faculty members of the rank of assistant professor or above, charged with advising the president regarding appointments, reappointments, promotions and tenure of faculty members. A subcommittee of the administration committee then "reviews" the department recommendation. During its review, it "interviews the candidate" as well as relevant faculty, "satisfies itself that the evidence the department has called upon is sound," and may "supplement the evidence provided by the department."

The subcommittee then presents a "confidential memorandum" to the full administration committee, which votes, after discussion, whether to accept the recommendation. After this vote, the president of the college makes his formal recommendation on tenure to the college cabinet. The cabinet, which consists of the president (as chair), the deans and all full professors, then votes whether to recommend tenure. If that vote is favorable, the tenure recommendation is forwarded to the board of trustees for approval.

### (2) Pomona's Grievance Procedure

The Handbook also describes the administrative grievance procedure a faculty member may invoke to review an unfavorable tenure decision.

The Handbook states that the faculty grievance committee, which consists of five members elected by the faculty, has the responsibility to "consider all

complaints concerning alleged infringements of academic freedom, academic due process, and the right to full and fair consideration; or discriminatory treatment . . . ." In cases involving "non-promotion of faculty or dismissal of non-tenured faculty, the Committee shall consider only charges of infringement of academic freedom or denial of full and fair consideration."

Although the "Board of Trustees, administration, or faculty committee may reaffirm the original decision . . . the [grievance committee's] recommendation[] shall represent the considered judgment of the faculty's elected representatives."

A grievance is initiated by a "[c]omplaint . . . in writing." If mediation of the complaint fails, the "plaintiff" is entitled to a "formal hearing," which must be tape-recorded. The grievance committee is then required to "report its findings and recommendations to the President and to the aggrieved faculty member."

As the foregoing demonstrates, Pomona's Handbook requires both a hearing and the taking of evidence in reaching its initial tenure decision, and provides for a "formal hearing" upon the filing of a grievance complaint by the dissatisfied faculty member. At the conclusion of the hearing, the grievance committee is required to make "findings" which it must report to the president and the complaining faculty member.

Section 1094.5 expressly provides that it is the *requirement* of a hearing and taking of evidence—not whether a hearing is actually held and evidence actually taken—that triggers the availability of mandamus review. This being so, Corin's exclusive remedy for any procedural defects which he believes existed in the tenure review or grievance processes is administrative mandamus. (See *Westlake Community Hosp.* v. *Superior Court* (1976) 17 Cal.3d 465, 484 [131 Cal.Rptr. 90, 551 P.2d 410].)

H.   *Corin's Due Process Claims*

█ Corin asserts for the first time here that "the procedure set forth in the . . . Handbook regarding the 'hearing' is so vague as to deny a grievant due process."

Section 1094.5, subdivision (b) provides that the scope of inquiry in reviewing a petition for administrative mandate "shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a *fair trial*; and whether there was any prejudicial

abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Italics added.)

The use of the words "fair trial" does not mean that Corin was entitled to a formal hearing under the due process clause. First, he has not been deprived of any liberty or property interest sufficient to require a formal hearing under the due process clause. (*King* v. *Regents of University of California, supra,* 138 Cal.App.3d at p. 815.) Second, the "fair trial" requirement is equivalent to a prescription that there be a fair administrative hearing. (*Guilbert* v. *Regents of University of California* (1979) 93 Cal.App.3d 233, 241 [155 Cal.Rptr. 583].)

An employee grievance proceeding may be a "hearing" which triggers the availability of mandamus review. (*Poschman* v. *Dumke, supra,* 31 Cal.App.3d at p. 938.) In *Poschman,* the Court of Appeal held that an unsuccessful tenure candidate at a state university stated a cause of action in administrative mandamus against the university where the tenure decision was reached pursuant to university regulations requiring a "hearing with testimony either oral or written, a dispositive recommendation or ruling," and "that records be kept of the proceedings." (*Ibid.*) The court made clear that it did not matter that the grievance hearing was " 'in no sense a trial'; a hearing suffices for administrative mandamus. [Citation.]" (*Ibid.*; see also *Ishimatsu* v. *Regents of University of California* (1968) 266 Cal.App.2d 854, 860-862 [72 Cal.Rptr. 756] [university grievance proceeding was a "hearing" within the meaning of section 1094.5].)

It appears that hearings were held and evidence was taken during Corin's tenure review process. However, we cannot on the record before us determine the exact nature of the hearing, or of the evidence taken. Pomona concedes that it submitted to the superior court only those portions of Pomona's administrative record that were necessary to establish that a hearing and evidence were required. Although Pomona introduced additional evidence here in an attempt to demonstrate the sufficiency of the hearing provided, we believe that the determination as to whether the proceedings were adequate, whether procedural irregularities occurred during the review process, and whether they were so prejudicial as to warrant the issuance of a writ of mandate should be made by the superior court only upon Corin's presentation of the proper pleading.

### III. DISPOSITION

The petition for writ of mandate is granted. The superior court is directed to set aside its order of April 10, 1995, overruling Pomona's demurrer to

Corin's complaint, and to enter a new and different order sustaining without leave to amend Pomona's demurrer to Corin's complaint. The temporary stay is vacated.

Fukuto, J., and Zebrowski, J., concurred.